**STATE of Alaska, Petitioner,**

v.

**Tyrone DAVENPORT, Respondent.**

No. 1639.

Supreme Court of Alaska.

May 14, 1973.

John E. Havelock, Atty. Gen., Juneau, Seaborn J. Buckalew, Jr., Dist. Atty., W. H. Hawley and Charles M. Merriner, Asst. Dist. Attys., Anchorage, for petitioner.

Herbert D. Soll, Public Defender, Bruce A. Bookman, Asst. Public Defender, Anchorage, for respondent.

Before RABINOWITZ, C. J., and CONNOR, ERWIN and BOOCHEVER, JJ.

## OPINION

RABINOWITZ, Chief Justice.

Respondent Tyrone Davenport was indicted on November 1, 1971 for the crime of receiving and concealing stolen property.[1] The indictment charged Davenport with the unlawful possession of six fur garments which were allegedly stolen from the Fur Traders, an Anchorage merchant. Prior to trial, Davenport filed a motion to suppress the several fur pieces which he claimed the state had illegally seized. The superior court granted his motion and the state has petitioned this court to review that decision.

The facts developed at the suppression hearing are as follows: On September 22, 1971, Investigator Robert Gray of the Anchorage Police Department obtained a warrant based upon his own affidavit to search the Davenport residence for "eight or nine handguns" which were stolen from Howard's Gun Shop in Anchorage. Gray's affidavit related that on September 22, 1971, the Anchorage police arrested Davenport in connection with a shooting incident at the Davenport home; and that shortly following the arrest, the police seized two handguns. The serial number of one of the handguns matched the serial number of a gun reported stolen from Howard's Gun Shop. The affidavit further alleged that

. . . later in the afternoon of September 22, 1971 your affiant was approached by inmate, Matthew Harris, and it was related to your affiant that he, Matthew Harris, had been in the Tyrone Davenport residence at 512 E. 12th Avenue, Apt. #9, approximately on the 16th day of September, 1971 and while there saw eight or nine handguns, which Davenport stated came from Howard's Gun Shop.

From testimony brought out at the suppression hearing, it appears that Harris also informed Gray that while at the Davenport residence on September 22, he had seen a number of fur garments; and moreover, he had seen Davenport place them in the attic above the kitchen. Harris was unable to tell Gray how Davenport came to acquire the furs, but Gray suspected that the furs might be among those which had been taken in a recent burglary of Fur Traders. Gray did not seek a warrant to search the Davenport residence for the furs, apparently because an assistant district attorney informed Gray that he had insufficient probable cause to obtain the warrant.

Investigator Rice of the Anchorage police was assigned to execute the search warrant which was issued for "eight or nine handguns, the property of Howard's Gun Shop". Gray indicated to Rice that he might discover some furs in the course of the search for the handguns and that the furs probably belonged to Fur Traders.

Rice and two other officers went to Davenport's residence to execute the warrant. They knocked at the door, and receiving no answer, they admitted themselves. Once inside, they found Davenport's father sleeping in a bedroom. They woke him and informed him of the purpose of the intrusion. After a search of the

---

1. AS 11.20.350 defines the crime of receiving and concealing stolen property as follows:

A person who buys, receives, or conceals money, goods, bank notes, or other thing which may be the subject of larceny and which has been taken, embezzled or stolen from another person, knowing it to have been taken, embezzled, or stolen, is punishable by a fine of not more than $1,000 and by imprisonment for not less than one year nor more than three years.

first floor, the officers asked the elder Davenport to show them to the attic. One of the three, Officer Smith, climbed up. Once inside the attic, Smith noticed three or four boxes of .38 caliber ammunition and a recess in the roofing material. Smith crawled over to the recess and observed three bundles inside. He withdrew one of the packages, a brown shopping bag, looked in it, and discovered that it contained furs. Smith examined the other parcels and found furs in them as well. Rice had told Smith that the search might uncover stolen furs in addition to the handguns, and so Smith handed the parcels containing the furs to his comrades below.

The furs had no labels and appeared to Rice to be both brand new and expensive. Recalling the Fur Traders' burglary, Rice concluded that the furs were probably stolen and seized them. On the return of the warrant, Rice listed seven fur garments. No handguns were seized or discovered in the course of the search of the Davenport residence.

At the suppression hearing Davenport argued that the furs were illegally seized since (a) they were not among the items listed on the warrant and were not reasonably related to the purpose of the search as required by Bell v. State, 482 P.2d 854 (Alaska 1971); (b) that the affidavit for the search warrant was insufficient and defective; and (c) that even assuming *Bell* permits seizure of items not enumerated in the warrant and unrelated to the purpose of the warrant, there was insufficient probable cause upon which to base the seizure of the furs. The superior court concluded that since the furs were not described in the warrant, nor were they related to the offense upon which the warrant was based, under Bell v. State,[2] the

seizure of the furs was illegal. The superior court did, however, find that the affidavit in support of the warrant was neither insufficient nor defective, and that the warrant was therefore valid.

I

Davenport challenges the superior court's finding that the search warrant for the handguns was valid. He claims that the affidavit was defective in that (a) it contained misstatements of fact and that (b) the statements in the affidavit were insufficient to establish probable cause to search.

In his affidavit, Investigator Gray claimed that

> . . . Tyrone Davenport was observed by a neighbor, Andrew Nelson, 512 E. 12th, Apt. 3, entering a storage area in the apartment complex at 512 E. 12th Avenue, remain a moment and then hurriedly left the storage area and entered his apartment.

The affidavit also asserts that the informant Matthew Harris "approached" Gray and revealed that he had seen the handguns at the Davenport residence. Davenport claims that these statements are false. Apparently, Gray did not know that the figure he described to the police was Davenport. Moreover, it seems that Gray contacted Harris, contrary to the assertion in the affidavit that Harris approached Gray. Davenport argues that these misstatements in the affidavit vitiate the validity of the warrant.

There is much disarray in the law on the question of whether, and to what extent, the validity of statements in an affidavit may be challenged.[3] A number of courts have indicated that a defendant may attack a search warrant on the grounds that the

---

2. 482 P.2d 854 (Alaska 1971).

3. *See,* Kipperman, Inaccurate Search Warrant Affidavits as a Ground for Suppressing Evidence, 84 Harv.L.Rev. 825 (1971) ; Mascolo, Impeaching the Credibility of Affidavits for Search Warrants: Piercing the Presumption of Validity, 44 Conn.B.J. 9 (1970) ; 15 Buff.L.Rev. 712

(1966) ; Note, Testing the Factual Basis for a Search Warrant, 67 Colum.L.Rev. 1529 (1967) ; 51 Cornell L.Q. 822 (1966) ; 34 Fordham L.Rev. 740 (1966) ; Comment, The Outwardly Sufficient Search Warrant Affidavit: What if it's False?, 19 U.C.L.A.L.Rev. 96 (1971).

affidavit presents material misstatements of fact.[4]

■ The state and federal constitutional requirement that warrants issue only upon a showing of probable cause,[5] in our opinion contains the implied mandate that the factual representations in the affidavit be truthful. We believe that since search warrants issue *ex parte*, the courts must be willing to investigate the truthfulness of the material allegations of the underlying affidavit in order to protect against the issuance of search warrants based on conjured assertions of probable cause. Thus, we believe that challenges to the search warrant and affidavit may be properly entertained during the suppression hearing.

■ However, in order for a misstatement of fact in an affidavit to fatally impair the validity of a search warrant, the misstatement must be material to the showing of probable cause upon which the warrant is based.[6] In the case before us,

it does not appear that the district judge was influenced by the misstatements in the affidavit to issue a search warrant which he would otherwise have denied. Even assuming the falsity of Gray's statements, we cannot conclude that they were material to a finding of probable cause to search.[7]

■■ Davenport also contends that the affidavit was insufficient because the affiant Gray relied on hearsay, and the affidavit fails to establish the reliability of the informant.[8] Specifically, Davenport contends that the reliability of the informant Harris was not sufficiently established by the affidavit. As the Supreme Court noted in Aguilar v. State of Texas, 378 U.S. 108 at 114, 84 S.Ct. 1509 at 1514, 12 L.Ed. 2d 723 (1964):

An affidavit may be based on hearsay and need not reflect the direct personal observations of the affiant . . . [but] the magistrate must be informed of some of the underlying circumstances

4. *See*, United States v. Bozza, 365 F.2d 206, 223–224 (2nd Cir. 1966); King v. United States, 282 F.2d 398 (4th Cir. 1960); United States v. Pearce, 275 F.2d 318, 321–322 (7th Cir. 1960); People v. Alfinito, 16 N.Y.2d 181, 264 N.Y.S.2d 243, 211 N.E.2d 644 (1965); Lerner v. United States, 151 A.2d 184 (D.C.Mun.Ct.App.1959). *But see, contra*, United States v. Gianaris, 25 F.R.D. 194 (D.C.D.C.1960); People v. Bak, 45 Ill.2d 140, 258 N.E.2d 341 (1970). In Rugendorf v. United States, 376 U.S. 528, 532, 84 S.Ct. 825, 11 L.Ed.2d 887 (1964), the Supreme Court, without passing on the question seemed to approve the policy of permitting challenges to the veracity of the underlying affidavit.

5. U.S.Const. amend. IV; Alaska Const. art. 1, § 14.

6. There was no showing at the suppression hearing that Gray intentionally distorted the facts as he knew them in an effort to obtain the warrant. We, therefore, do not now decide whether an intentionally falsified statement of nonmaterial fact in an affidavit will affect the validity of a search warrant.

7. Excluding the questioned statements of fact from consideration, the affidavit still asserts that a) while at the Davenport residence, Harris saw eight or nine hand-

guns which Davenport informed him were taken from Howard's Gun Shop; b) one of the handguns stolen from Howard's was found in the storage area following the shooting incident which led to Davenport's arrest, and c) shortly after the shooting incident someone, though perhaps not Davenport, was seen entering the storage area where the gun was found, and then after a moment proceeding hastily into the Davenport residence. It is our view that these allegations were sufficient to establish probable cause for the issuance of the search warrant.

8. We simply note Davenport's argument that Gray's failure to name the source of his information a) that Howard's Gun Shop had been burglarized, and b) that a gun had been discovered at Davenport's residence following his arrest invalidates the warrant. We do not agree. It is not necessary that every assertion of fact be traced to its ultimate source. The Fourth Amendment's requirements are practical and not abstract, and affidavits "must be tested and interpreted by magistrates and courts in a commonsense and realistic fashion. . . . Technical requirements of elaborate specificity . . have no proper place in this area." United States v. Ventresca, 380 U.S. 102, 108, 85 S.Ct. 741, 746, 13 L.Ed.2d 684 (1965).

from which the officer [the affiant] concluded that the informant . . . was "credible" or his information reliable.[9]

We believe that in the instant case, there were substantial bases for crediting the informant's story. The affidavit avers that Harris' information was acquired by his personal and recent observation. Moreover, his story was corroborated in the affidavit by the fact that one of the handguns discovered in connection with Davenport's arrest possessed a serial number which matched the serial number of a handgun taken from Howard's Gun Shop. This corroboration significantly reduced the possibility that Harris' story was nothing more than a "reckless or prevaricating tale." Jones v. United States, 362 U.S. 257, 271, 80 S.Ct. 725, 4 L.Ed.2d 697, 708 (1960).

 We do not agree with Davenport's claim that the affidavit failed to show that the informant was credible or reliable, and that consequently, under Spinelli v. United States, 393 U.S. 410, 89 S. Ct. 584, 21 L.Ed.2d 637 (1969), the statement of the informant could not support a showing of probable cause. Unlike the present case, the affidavit in *Spinelli* relied on observations of an *unidentified* informant, and did not explain *how the informant came by his information*. See, United States v. Harris, 403 U.S. 573, 579, 91 S.Ct. 2075, 29 L.Ed.2d 723, 731 (1971). An affidavit may rely on the observations of a third party, "so long as a substantial basis for crediting the hearsay is presented." Jones v. United States, 362 U.S. 257, 269, 80 S.Ct. 725, 735, 4 L.Ed.2d 697, 707 (1960). *Accord,* United States v. Harris, *supra,* (Opinion of Chief Justice Burger joined by Black, J., and Blackmun, J.). Since the hearsay in the instant case was based on the information of an identified informant, and that information was acquired by the informant's own observation, and furthermore, since the independent dis-

covery of the handgun at the time of Davenport's arrest tended to corroborate Harris' story, we believe that there was a substantial basis for crediting the hearsay. We are therefore unable to agree that Gray's affidavit failed to establish sufficient probable cause for the issuance of a search warrant.

II

The state contends that the suppression of the furs was error. The superior court held that since the furs were neither described in the warrant nor related to the offense for which the warrant issued—the burglary of Howard's Gun Shop—the rule of Bell v. State, *supra,* prohibited the seizure even though the furs were discovered in the course of a valid search.

In Bell v. State, *supra,* we said that

. . . an officer may seize evidence of a crime even though such property is not particularly described in the search warrant when the objects discovered and seized are reasonably related to the offense in question, when the searching officer at the time of the seizure has a reasonable basis for drawing a connection between the observed objects and the crime which furnished a basis for the search warrant, and the discovery of such property is made in the course of a good faith search conducted within the authorized perimeters of the search warrant. (Footnote omitted.) [10]

By describing in *Bell* this limited exception to the Fourth Amendment's requirement that items to be seized be described in the warrant, we did not intend to suggest that other exceptions might not exist. Indeed, only last year in Davis v. State, 499 P.2d 1025 (Alaska 1972) we recognized another exception to the particularity requirement. In *Davis* we upheld the seizure of an item that had not been described in the search warrant, but which the executing officer had probable cause to believe was related to another crime being conducted in his

---

9. Quoted in Morris v. State, 473 P.2d 603, 605 (Alaska 1970).

10. 482 P.2d 854, 860.

presence.[11] Thus, the items seized need not necessarily be connected to the crime which served as the basis for the search warrant.

The Fourth Amendment to the United States Constitution provides:

> The right of the people to be secure in their persons, houses, papers, and effects against unreasonable searches and seizures, shall not be violated. No warrants shall issue, but upon probable cause, supported by oath or affirmation, *and particularly describing the place to be searched, and the persons or things to be seized.* (Emphasis added.)[12]

In Coolidge v. New Hampshire, 403 U.S. 443, 467, 91 S.Ct. 2022, 29 L.Ed.2d 564, 583 (1971) Justice Stewart pointed out that two constitutional protections are served by the warrant requirement. First, independent judicial scrutiny protects against searches not justified by a prior determination of probable cause. *See, e. g.* McDonald v. United States, 335 U.S. 451, 69 S.Ct. 191, 93 L.Ed. 153 (1948), Warden v. Hayden, 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967); Katz v. United States, 389 U.S. 347, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967). Secondly, the "particular description" requirement protects against the evil of the general warrant. *See, e. g.* Boyd v. United States, 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746, 748–751 (1886); Marron v. United States, 275 U.S. 192, 195–196, 48 S.Ct. 74, 72 L.Ed. 231, 236, 237 (1927).

As we noted in Bell v. State, *supra,* the Supreme Court in Marron v. United States, 275 U.S. 192, 48 S.Ct. 74, 72 L.Ed. 231 (1927) gave a strict and uncompromising reading to the "particularity" requirement.

> The requirement that warrants shall particularly describe the things to be seized makes general searches under them impossible and prevents the seizure of one thing under a warrant describing another. As to what is to be taken, nothing is left to the discretion of the officer executing the warrant.[13]

The requirement that warrants particularly describe the things to be seized was designed to prevent general exploratory searches of a person's belongings.[14] The Fourth Amendment operates to secure "the sanctity of a man's home and the privacies of life" from indiscriminate searches by officials of the state.[15]

The Supreme Court loosened the *Marron* rule in Harris v. United States, 331 U.S. 145, 67 S.Ct. 1098, 91 L.Ed. 1399 (1947). There the Court upheld the seizure of property discovered in the course of a lawful search, even though the property seized was unrelated to the crime for which the search was undertaken, and was not described in the search warrant. The search was conducted incident to an arrest and produced a collection of draft registration material, the possession of which was a federal offense. The Court seemed to conclude that the officers had sufficient cause to believe an offense was being committed, and that they were, therefore, justified in seizing the evidence.[16]

Later the Supreme Court noted in Harris v. United States, 390 U.S. 234, 235, 88

---

11. *Davis* was concerned with the discovery of a concealable firearm in the possession of a felon. The court held that under the circumstances the officer had probable cause to believe that the crime was being committed in his presence.

12. Article I, section 14 of the Constitution of the State of Alaska is identical except for the addition of the term "and other property" in the catalogue of protected zones.

13. 275 U.S. 192, 196, 48 S.Ct. 74, 76, 72 L.Ed. 231, 236. *Accord* Trupiano v. United States, 334 U.S. 699, 68 S.Ct. 1229, 92 L.Ed. 1663 (1948).

14. Coolidge v. New Hampshire, 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564, 583 (1971); Boyd v. United States, 116 U.S. 616, 6 S.Ct. 524, 29 L.Ed. 746, 751 (1886).

15. Boyd v. United States, 116 U.S. 616, 630, 6 S.Ct. 524, 532, 29 L.Ed. 746, 751 (1886).

16. 331 U.S. at 154–155, 67 S.Ct. 1098, 91 L.Ed. 1407–1408.

S.Ct. 992, 993, 19 L.Ed.2d 1067, 1069 (1968):

> . . . objects falling in the plain view of an officer who has the right to be in the position to have that view are subject to seizure and may be introduced into evidence. Ker v. California, 374 U.S. 23, 42–43, 83 S.Ct. 1623, 1634, 1635, 10 L. Ed.2d 726, 743 (1963); United States v. Lee, 274 U.S. 559, 47 S.Ct. 746, 71 L.Ed. 1202 (1927); Hester v. United States, 265 U.S. 57, 44 S.Ct. 445, 68 L.Ed. 898 (1924).

 It is not enough that the objects seized in the course of a search simply be in "plain-view." "There must, of course, be a nexus—automatically provided in the case of fruits, instrumentalities or contraband—between the item to be seized and criminal behavior." Warden v. Hayden, 387 U.S. 294, 307, 87 S.Ct. 1642, 1650, 18 L.Ed.2d 782, 792 (1967). The officers must have probable cause to believe that the article not named in the warrant, but found during the search, will aid in a particular conviction for an offense. Probable cause under these circumstances exists only when the information the officers possess immediately following discovery is sufficient to warrant a reasonable man of reasonable caution in the belief that an offense has been or is being committed. *Cf.* Brinegar v. United States, 338 U.S. 160, 69 S.Ct. 1302, 93 L.Ed. 1879, 1889 (1949); United States v. Rich, 407 F.2d 434 (5th Cir. 1969); Chin Kay v. United States, 311 F.2d 317 (9th Cir. 1962). Accordingly, we hold that when an officer has probable cause to believe that objects he discovers in the course of a valid search conducted under a valid warrant are the fruits of a particular theft, that officer may seize those items even though they are neither listed on the search warrant nor related to the crime which served as the basis for the warrant.[17]

 Officer Smith was well within the proper scope of the search for the handguns listed in the warrant when he uncovered the fur pieces. Handguns of the description set out in the warrant might easily have been concealed in the recess of the attic. On the basis of the record we can discover no reason for finding that the search was improperly extended, and thus we conclude that Officer Smith had a right to be in a position to view the furs which were discovered.

 We find that the officers had probable cause to believe the furs were the fruits of the Fur Trader's burglary. Officer Rice knew that certain furs had recently been stolen from Fur Traders. The numerous fur pieces which the officers uncovered appeared to be new, there were no retail labels attached to the garments, and they appeared to have been carefully hidden. Taken together, these facts presented the police with a reasonable basis to believe the furs were stolen, and that the crime of possessing stolen goods was being committed in their presence.

### III

Finally, Davenport contends that the seizure was invalid because prior to the search, the police had probable cause to believe they would find the furs in his attic, but failed to describe the furs in the warrant. He claims that under these circumstances:

a) the seizure was not made pursuant to a good faith search,

b) the seizure was not *inadvertent,* and therefore, the seizure was invalid.

 In Davis v. State, 499 P.2d 1025 (Alaska 1972), and in Bell v. State, 482 P. 2d 854 (Alaska 1970), we upheld the sei-

---

17. *See* Aron v. United States, 382 F.2d 965 (8th Cir. 1967); Seymour v. United States, 369 F.2d 825 (10th Cir. 1966); United States v. Eisner, 297 F.2d 595 (6th Cir. 1962); United States v. McDonnell, 315 F.Supp. 152 (D.Neb.1970); People v. Christeson, 122 Ill.App.2d 192, 258 N.E.2d 142 (1970); Commonwealth v. Wojcik, 266 N.E.2d 645 (Mass.1971). *Contra,* United States v. Dzialak, 441 F. 2d 212 (2nd Cir. 1971), Nickens v. La-Vallee, 391 F.2d 123 (2nd Cir. 1968).

zure of items which were not described in the search warrant. Essential to the validity of such a seizure is that the search which leads to the discovery of the unlisted material be conducted in good faith.[18] This court will not countenance the use of an otherwise valid warrant for the purpose of conducting a generalized search for incriminating evidence, nor will we look with favor upon any search undertaken with the undeclared intention of seizing property which has not been described in the warrant.

■ Davenport's argument is that since the police had reason to believe they might find the furs in the attic, the search lacked good faith. There is no evidence in the record to suggest that the search for the guns was a pretext to conduct a search for the furs. The search for the handguns was undertaken pursuant to a valid warrant and conducted within the scope of the objectives of that warrant. The warrant was not employed as a means for exercising a general search. There was no evidence produced to suggest that the search would have been less extensive or in any way conducted differently had the police not received information relating to the furs. We cannot agree that simply because the police had reason to believe that they might find certain furs in the course of their search, that the search was therefore tainted with bad faith. The underlying basis for the intrusion into the Davenport home was legitimate, and the search

was conducted in a lawful manner. Thus, we conclude that the search was conducted in good faith.

■ The other prong of Davenport's argument is that the discovery of the furs could not have been inadvertent, and that, therefore, under Coolidge v. New Hampshire, 403 U.S. 443, 91 S.Ct. 2022, 29 L. Ed.2d 564 (1971) the seizure was illegal. In *Coolidge,* Justice Stewart, speaking for only four of the nine members of the Court, ruled that the "plain-view" exception to the warrant requirement applies only where the discovery is *inadvertent.*[19]

In *Coolidge* the police arrested the defendant in front of his home. One of his automobiles, which was parked in the driveway, was seized by the police at the time of the arrest, towed away and later searched for evidence of the crime. Justice Stewart noted, "[the police] knew the automobile's exact description and location well in advance; they intended to seize it when they came upon Coolidge's property."[20] Justice Stewart argued that the plain-view exception would not apply under those circumstances.

The rationale of the [plain-view] exception to the warrant requirement is that a plain-view seizure will not turn an initially valid (and therefore limited) search into a "general" one, while the inconvenience of procuring a warrant to cover an inadvertent discovery is great. But where the discovery is anticipated, where the police know in advance the lo-

18. Davis v. State, 499 P.2d 1025, 1037 (Alaska 1972) ; Bell v. State, 482 P.2d 854, 859 (Alaska 1970).

19. 403 U.S. 443, 469, 91 S.Ct. 2022, 29 L.Ed.2d 585. Substantial controversy surrounds this portion of the opinion, especially since Justice Stewart left ambiguous the limits of expectation which the police may possess prior to discovery. *See* Note, The Supreme Court, 1970 Term, 85 Harv.L.Rev. 40, 244. The California Supreme Court recently declined to follow the *Coolidge* plurality's inadvertence rule, on the grounds that only four members of the Court (Stewart, J., Douglas, J., Brennan, J., and Marshall, J.) joined in that portion of the opinion. Four

others specifically disagreed with it (Dis. Opin. by Black, J., joined by Burger, C. J., and Blackmun, J.; and Dis. Opin. by White, J., 403 U.S. 505–510, 522, 91 S.Ct. 2022), and Justice Harlan concurred only in the plurality's judgment but not its reasoning. 403 U.S. 491, 91 S.Ct. 2022. North v. Superior Court of Riverside County, 8 Cal.3d 301, 104 Cal.Rptr. 833, 502 P.2d 1305, 1308 (Cal.1972).

20. 403 U.S. 443, 472, 91 S.Ct. 2022, 2041, 29 L.Ed.2d 564, 586–587. There is a hint in Stewart's opinion that had the property been "contraband or stolen goods or objects dangerous in themselves," a different rule might have applied.

cation of the evidence and intend to seize it, the situation is altogether different.[21]

Unlike the circumstances in *Coolidge,* the police in the case at bar neither knew the exact description of the property to be seized nor possessed any intent formed prior to discovery of the furs to seize them. The police in *Coolidge* could have easily obtained a warrant to seize the automobile. But having no idea prior to the search whether the furs spotted by the informant Harris were stolen, the police in the case at bar lacked sufficient probable cause upon which to base a warrant for the furs.

The plurality in *Coolidge* made clear that the plain-view doctrine does serve certain defensible purposes.

As against the minor peril to Fourth Amendment protections, there is a major gain in effective law enforcement. Where, once an otherwise lawful search is in progress, the police inadvertently come upon a piece of evidence, it would often be a needless inconvenience, and sometimes dangerous—to the evidence or

to the police themselves—to require them to ignore it until they have obtained a warrant particularly describing it.[22]

It seems to us unreasonable to deny the police the right to seize, simply because the police had some idea they might find the material which they later discovered. Under a wide variety of situations, the police will lack probable cause sufficient to secure a warrant to search for items later discovered in the course of a search. In the case at hand, the police knew only that some furs might be found. Prior to the search, the police lacked probable cause to believe that they would find furs which were the fruits of a crime. The police had probable cause to search for handguns, were conducting their search under a proper warrant, and the search was properly limited to the perimeters of the warrant.[23] The seizure of the fur garments was lawful.

Thus we find the superior court's suppression of the fur garments erroneous. The case is remanded for further proceedings consistent with this opinion.

FITZGERALD, J., not participating.

21. 403 U.S. 443, 469–470, 91 S.Ct. 2022, 2040, 29 L.Ed.2d 585.

22. 403 U.S. 443, 467–468, 90 S.Ct. 2022, 2039, 29 L.Ed.2d 564, 584.

23. It has been suggested that Justice Stewart's concern was really with the use of the plain-view doctrine as a supplement to the search incident to arrest exception to the warrant requirement. The fear is

that the authorities will time arrests so that the police may have the benefit of a "view" at the time of the arrest. "This use of the arrest power for the ulterior purpose of gaining access to a person's house amounts to a planned warrantless search and seems at the heart of Justice Stewart's concern." Note, The Supreme Court, 1970 Term, 85 Harv.L.Rev. 40, 245 (1972).